UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROBERT D. CRAWFORD,<br>    *Plaintiff*,<br>    *v.*<br>CITY OF NEW LONDON, *et al.*,<br>    *Defendants*. | Civil No. 3:11cv1371 (JBA)<br><br><br>January 16, 2014 |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

On August 31, 2012, Plaintiff Robert Crawford filed a ten-count Complaint [Doc. # 1] against Defendants the City of New London ("New London"), Margaret Ackley, the Chief of Police of the New London Police Department, Officer Cornelius Rodgers, Officer Mugovero, Sergeant L.J. Keating, Lieutenant Bergeson, Patrolman Cavanaugh, Patrolman Hulland, Patrolman McDonald, and Sergeant Kevin McBride,[1] all of the New London Police Department, alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983, in addition to several state law claims, arising out of Plaintiff's arrest by Defendants during a boys' junior varsity basketball game at New London High School. Specifically, Plaintiff brings claims for Excessive Use of Force in violation of his Fourth and Fourteenth Amendment rights (Count One); False Arrest in violation of his Fourth and Fourteenth Amendment rights (Count Two); Malicious Prosecution in violation of his Fourteenth Amendment rights (Count Three)[2]; Assault and Battery (Count Four); False Arrest (Count Five); Intentional Infliction of Emotional Distress (Count Six);

---

[1] At oral argument, Plaintiff's counsel agreed that Sergeant McBride should be dismissed from this case because he had no personal involvement in the incident giving rise to Plaintiff's claims.

[2] In his opposition [Doc. # 52], Plaintiff withdrew his claim for malicious prosecution.

Negligent Infliction of Emotional Distress (Count Seven); Negligence (Count Eight); a *Monell* claim[3] against Defendants Chief Ackley and New London (Count Nine); and a claim for Indemnification and Municipal Liability against Defendant New London pursuant to Conn. Gen. Stat. §§ 7-465 and 52-557n (Count Ten).  Defendants now move for summary judgment on each of Plaintiff's claims, arguing that the videotape of Plaintiff's arrest leaves no outstanding issues of material fact in the case.  For the reasons that follow, Defendants' motion will be granted in part and denied in part.

I.      **Background**

        On February 4, 2010, Plaintiff attended his grandson's junior varsity basketball game at the New London High School gymnasium.  (*See* Crawford Aff., Ex. H to Pls.' Loc. R. 56(a)2 Stmt. [Doc. # 52-1] ¶¶ 2–3.)  Play between the two teams became increasingly physical as the game went on.  (*See id.* ¶ 4; Crawford Dep. Tr., Ex. A to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 49] at 16; Parker Aff., Ex. B to Defs.' 56(a)1 Stmt. ¶ 5; Poblete Aff. ¶ 5.)  Eventually, the verbal taunting and the pushing and shoving escalated into a physical altercation between two players.  (*See* Crawford Aff. ¶ 6; Parker Aff. ¶ 5; Poblete Aff. ¶ 5.)  One of the players on the New London team punched a player on the Griswold team, and a fight broke out.  (*See* Crawford Aff. ¶ 6; Robillard Aff., Ex. G to Pl.'s 56(a)2 Stmt. ¶ 5; Parker Aff. ¶ 5; Poblete Aff. ¶ 5.)

        The parties' descriptions of the events that followed this punch differ from each other.  Plaintiff claims that the referees left the court after the fight broke out and that there were no security guards present to break up the fight.  (Crawford Aff. ¶ 9.)  When Plaintiff realized that no one could control the New London player or protect the

---

[3] This claim is styled as "Deliberate Indifference to Civil Rights" in Plaintiff's Complaint, but Plaintiff's counsel clarified at oral argument that Count Nine was a *Monell* claim.

Griswold player from his attack, he ran onto the Court and brought the New London player to the floor. (*See* Crawford Aff. ¶¶ 11–14; Robillard Aff. ¶¶ 7–8.) Plaintiff let the New London player up once he appeared to calm down, but he immediately chased after the Griswold player and attacked him again. (*See* Crawford Aff. ¶¶ 14–15; Robillard Aff. ¶¶ 9–11, 13.) The New London player again swung at the Griswold player, hitting the latter's mother, Joanne Robillard, who had been tending to his injuries and trying to protect him. (*See* Robillard Aff. ¶¶ 12, 14; Crawford Aff. ¶¶ 15–16.) Plaintiff ran over to the New London player for a second time and brought him to the floor, holding him until a security guard came over to subdue him. (*See* Crawford Aff. ¶ 17; Robillard Aff. ¶ 15.)

Defendants claim that after the fight broke out, Plaintiff ran onto the court, yelling at the New London player and attempting to grab him, but they were separated. (*See* Parker Aff. ¶ 6.) A security guard led the New London player off of the court, but he broke away and ran back in the direction of the Griswold player. (*See id.* ¶ 8.) At this point, Defendant claims that Plaintiff chased the New London player and tackled him, punching him several times after bringing him to the floor. (*See id.* ¶ 9, Poblete Aff. ¶ 7; Parker Aff. ¶ 9; Crespo Aff., Ex. E to Defs.' 56(a)1 Stmt. ¶ 8.) A video recording taken by one of the spectators—Roberto Crespo—shows Plaintiff run onto the Court in the direction of the New London Player. (*See* Basketball Game Video, Ex. B to Pl.'s 56(a)2 Stmt.; *see also* Ex. A to Crespo Aff.) In the video, Plaintiff tackles the New London player and they struggle on the ground, where Plaintiff appears to throw several punches toward his head. (*See id.*) However, there are gaps in the recording, and the video does not show the entirety of the altercation between Plaintiff and the New London player.

When the fight broke out, a concerned citizen called 911 to alert the police to the escalating situation. (*See* Incident Report, Ex. D to Defs.' 56(a)1 Stmt. at 7.) All available

officers were dispatched to the school, including Captain Todd Bergeson, Sergeant Lawrence Keating, and Officers Graham Mugovero, Cornelius Rodgers, Michael Cavanaugh, Eric Hulland, and Russell MacDonald.  (*See* Bergeson Aff., Ex. G to Defs.' 56(a)1 Stmt. ¶ 4; Keating Aff., Ex. H to Defs.' 56(a)1 Stmt. ¶ 4; Mugovero Aff., Ex. I to Defs.' 56(a)1 Stmt. ¶ 4; Rodgers Aff., Ex. J to Defs.' 56(a)1 Stmt. ¶ 4; Cavanaugh Aff. Ex. K to Defs.' 56(a)1 Stmt. ¶ 4; Hulland Aff., Ex. L to Defs.' 56(a)1 Stmt. ¶ 4; MacDonald Aff. Ex. M to Defs.' 56(a)1 Stmt. ¶ 4.)  The officers arrived shortly after the fight had broken up and things had calmed down in the gymnasium.  (*See* Robillard Aff. ¶ 16.)  Plaintiff and Ms. Robillard were asked to go into the hallway outside of the gymnasium to give their statements to the police.  (*See id.*).  Meanwhile, Defendant Rodgers interviewed several witnesses, including the New London head coach and the security officers who worked the game.  (*See* Rodgers Aff. ¶¶ 6–9.)  The witnesses informed him that a man had run onto the court and tackled one of the players, and the police were able to identify this man as Plaintiff.  (*See id.*)  Defendant Rodgers informed Defendant Keating that Plaintiff had been identified as the man who had run onto the court and tackled the New London player.  (*See id.* ¶ 10.)  While Defendants Rodgers and Keating were in the hallway speaking, Mr. Crespo came forward to show them the video he had recorded showing Plaintiff tackling the New London player.  (*See id.* ¶ 11.)

The parties' descriptions of the events again diverge at this point.  Plaintiff claims that the police never took his statement, and rather accused him of attacking the New London player.  (*See* Crawford Aff. ¶¶ 20–21; Robillard Aff. ¶¶ 16–17.)  When Plaintiff inquired where the police officer had gotten this information and asked for a chance to give his side of the story, the officer told him to "shut up."  (*See* Crawford Aff. ¶¶ 21–22; Robillard Aff. ¶ 18.)  The officer grabbed Plaintiff, pushed him up against the wall, and

put his hands behind his back.  (*See* Robillard Aff. ¶ 19.)  Plaintiff claims he did not resist the officer's attempts to handcuff him, but that another office grabbed his throat and pulled him backwards, after which a group of three or four officers knocked him to the ground.  (*See* Crawford Aff. ¶¶ 24–25; Robillard Aff. ¶¶ 21–22.)  Plaintiff claims that the officers repeatedly pushed his head against the floor and kneeled on his back.  (*See* Crawford Aff. ¶ 25.)  Plaintiff claims the officers cut him with the handcuffs such that his wrists bled, that one officer threatened to taser him and slammed his head into the floor, and that he fractured a tooth and dislocated his jaw when his head was slammed into the ground.  (*See id.* ¶¶ 25–26; *see also* Medical Report of Dr. Shifreen, Ex. D to Pl.'s 56(a)2 Stmt. at 3.)  Plaintiff claims to have blacked out and to have been unable to get up off of the floor without assistance.  (*See* Crawford Aff. ¶ 27.)

Defendant claims that when Defendants Keating and Bergeson began to interview Plaintiff regarding the incident, Plaintiff became verbally confrontational, yelling and using profanity.  (*See* Incident Report at 8.)   Despite warnings from Defendant Keating, Plaintiff continued to yell and swear at the officers.  (*See* Keating Aff. ¶ 7.)  Defendant Keating informed Plaintiff that he was under arrest for assaulting a juvenile, and put his hand around Plaintiff's wrist to get him into handcuffing position.  (*See id.*)  Defendant Keating turned Plaintiff to face a wall in order to handcuff him, but, as several other officers moved in to assist with the arrest, Plaintiff resisted by tensing up and pushing back off of the wall and into the officers.  (*See id.*)  Defendant claims that as a result of Plaintiff's resistance, the officers took Plaintiff to the ground for his safety by lowering him onto his backside and turning him over into the prone position to be handcuffed.  (*See id.* ¶ 8.)  None of the officers struck or pushed Plaintiff while he was on the ground,

but Plaintiff continued to resist, despite orders to cease his resistance. (*See id.*) Plaintiff's resistance only ended once he was handcuffed. (*See id.*)

A video recording of the hallway outside of the gymnasium, which does not include an audio component, captured footage of Plaintiff's arrest. (*See* Gymnasium Hallway Video, Ex. A to Pl.'s 56(a)2 Stmt.) In the video, Plaintiff is seen facing against a wall to be handcuffed. (*See id.*) Plaintiff then falls backward to the ground with several officers, but it is not apparent from the video whether Plaintiff pushed himself backward off of the wall, or whether he was pulled down by the other officers. (*See id.*) Plaintiff remains on the ground, surrounded by a group of officers for about a minute. (*See id.*) However, his head is obscured by the other officers, and it is not clear from the video whether any of the officers struck Plaintiff while he was on the ground. (*See id.*) Eventually, Plaintiff is helped to his feet by several officers and escorted out of the building. (*See id.*) Several minutes after Plaintiff is led outside, a janitor can be seen on the recording using some sort of cleaning product to mop up the area where Plaintiff had been brought to the ground by the officers. (*See id.*) Plaintiff claims that this image shows that his blood was on the floor.

Plaintiff was taken to the police station and was charged with Third Degree Assault, Risk of Injury to a Minor, and Interfering With an Officer. (*See* Incident Report at 6–7.) Plaintiff appeared in court seven times in connection with the charges, which were eventually nolled. (*See* Crawford Dep. Tr. at 36–37.) Plaintiff never filed a civilian complaint with the New London Police Department as a result of the incident and never complained about his injuries during the course of his arrest or while he was being held at the police station. (*See id.* at 42.) However, Plaintiff subsequently sought medical treatment for his injuries, which included a fractured tooth, a dislocated jaw, headaches, a

possible detached retina, and a back and shoulder sprain.  (*See* Medical Report of Dr. Shifreen.)  Plaintiff also suffered depression, anxiety, public humiliation, and nightmares as a result of the incident, and is "emotionally devastated" because of it.  (Crawford Aff. ¶¶ 33–34.)

II.    **Discussion**[4]

A.    **Motion to Strike**

As an initial matter, Plaintiff has included in his opposition to the summary judgment motion a section that he styles as a motion to strike.  (*See* Pl.'s Opp'n [Doc. # 52] at 7-10.)  Specifically, Plaintiff moves to strike material facts 5 and 12 through 24 from Defendant's 56(a)1 Statement, arguing that because Plaintiff has submitted evidence disputing these asserted facts, the Court may not properly rely on them for the purposes of granting summary judgment.  In response, Defendants argue that the Court should disregard or deny the Plaintiff's motion as unnecessary because the Court need not rely on the challenged statements of fact.  *See, e.g.*, *Radolf v. Univ. of Conn.*, 364 F. Supp. 2d

---

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.,* 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

204, 230 (D. Conn. 2005) (denying as moot motion to strike where the court did not rely on challenged statements and exhibits); *Waananen v. Barry*, 343 F. Supp. 2d 161, 172 (D. Conn. 2004) (same).    It is not clear why Plaintiff believes he is entitled to have the challenged statements struck from the record.  Plaintiff has timely filed his Loc. R. 56(a)2 Statement, and thus where Plaintiff has challenged asserted facts and submitted evidence disputing Defendants' version of events, the Court will not accept Defendants' asserted facts as undisputed.  Therefore, the Court denies Plaintiff's "motion" as moot.

## B.    Count One – Excessive Force

Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claim because they did not use unreasonable force against Plaintiff, the officers who observed Plaintiff's arrest did not have a duty to intervene, and they are entitled to qualified immunity.

### 1.    *Excessive Force*

"[A p]olice officer's application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'"  *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. O'Connor,* 490 U.S. 386, 397 (1989)).  Although police officers are entitled to use some degree of force when an arrestee is resisting arrest, the mere fact that a suspect resists does not render an excessive use of force objectively reasonable.  *See Sullivan v. Gagnier,* 255 F.3d 161, 165–66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists, threatens, or assaults the officer no doubt justifies the officer's use of *some* degree of force, but it does not give the officer license to use force without limit." (emphasis in original)).  Determining whether an officer's conduct was objectively reasonable requires balancing a

plaintiff's Fourth Amendment rights against competing governmental interests and considering the circumstances from the perspective of a reasonable officer on the scene, including the severity of the underlying crime, the need for split-second decisions in tense situations, the risk to the officer and others, and whether the suspect resisted or fled from arrest.  *See Graham*, 490 U.S. at 396–97.  "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officer's conduct was objectively unreasonable." *Amnesty America v. Town of West Hartford,* 361 F .3d 113, 123 (2d Cir. 2004).

Defendants argue that their use of force was authorized pursuant to Conn. Gen. Stat. § 53a-22[5] and was reasonable under the circumstances in light of Plaintiff's resistance and the crime of which he was suspected.   In making this argument, Defendants rely entirely on their description of the events leading to Plaintiff's arrest, and ignore the evidence Plaintiff offers to dispute that description.   Defendants claim that Plaintiff was verbally confrontational and physically resisted arrest, and aver that they never struck him once he was on the ground.  Defendants rely on *Scott v. Harris*, 550 U.S. 372 (2007) for the proposition that this Court can also ignore Plaintiff's version of events because there is a videotape of Plaintiff's arrest.  In *Scott*, the Supreme Court held that the

---

[5] Conn. Gen. Stat. § 53a-22(b) provides, in relevant part:
[An officer] . . . is justified in using physical force upon another person when and to the extent that he or she reasonably believes such to be necessary to: (1) Effect an arrest or prevent the escape from custody of a person whom he or she reasonably believes to have committed an offense, unless he or she knows that the arrest or custody is unauthorized; or (2) defend himself or herself or a third person from the use or imminent use of physical force while effecting or attempting to effect an arrest or while preventing or attempting to prevent an escape.

appellate court should not have adopted the plaintiff's version of events on a motion for summary judgment when the plaintiff's version of events was contradicted by video evidence.  *See id.* at 380–81 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals . . .  should have viewed the facts in the light depicted by the videotape.").

Unlike the video in *Scott*, here the video of Plaintiff's arrest does not "blatantly contradict" his version of events.  There is no audio component of the security camera footage in the hallway, and thus the video does not show whether or not Plaintiff was verbally confrontational with the officers prior to his arrest.  It cannot be readily determined from the video whether Plaintiff pushed back off the wall, resisting the officers' attempts to handcuff him, or whether he was pulled backward by an officer as he claims.  On the video, once Plaintiff is on the floor, other officers in the frame block the view of Plaintiff such that the viewer cannot tell whether the officers struck him or slammed his head against the ground as he claims, or whether he continued to resist arrest, as Defendants claim.  Furthermore, Plaintiff has offered independent evidence in support of his version of his arrest.  Mrs. Robillard avers that the officers knocked Plaintiff to the ground, and that he "was not resisting or doing anything whatsoever to deserve that kind of treatment."  (Robillard Aff. ¶¶ 21–22.)   Defendants also offer evidence that he suffered serious injuries during the course of his arrest, which could give

10

rise to the inference that Plaintiff hit his head with a significant amount of force.  (*See* Medical Report of Dr. Shifreen (detailing Plaintiff's injuries, which include a fractured tooth, a dislocated jaw, headaches, a possible detached retina, and a back and shoulder sprain).)  Therefore, even accepting the facts in the light portrayed by the video, a jury crediting Plaintiff's version of events could conclude that Plaintiff did not verbally or physically resist the officers, and that, without provocation, multiple officers first knocked Plaintiff to the ground and then struck him in the head, causing serious injury, in violation of Plaintiff's Fourth Amendment right to be free from the use of excessive force.

Because the video does not entirely contradict Plaintiff's version of events, there remain genuine issues of material fact in dispute, including whether or not Plaintiff resisted arrest, and the amount of force Defendants used when arresting Plaintiff.  In light of these factual disputes Defendants' motion for summary judgment on Count One is denied.  *See Amnesty America,* 361 F.3d at 124 ("Because a reasonable jury could also find that the officers gratuitously inflicted pain in a manner that was not a reasonable response to the circumstances, however, the determination as to the objective reasonableness of the force used must be made by a jury following a trial").

### 2.    *Duty to Intercede*

Defendants argue that the officers who were not directly involved in Plaintiff's arrest are entitled to summary judgment because they had no duty to intercede.  "A police officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (internal citations and quotation marks omitted).  Defendants argue that because their use of force was reasonable under the circumstances, Plaintiff's constitutional rights were not violated and the officers at the scene therefore

had no duty to intercede on his behalf.  Because there remain outstanding questions of material fact with respect to whether the officers used excessive force in violation of Plaintiff's constitutional rights, Defendants' motion for summary judgment on this ground is denied.

### 3.   *Qualified Immunity*

Defendants also move for summary judgment on Plaintiff's excessive force claim on the basis that they are entitled to qualified immunity.  Qualified immunity shields government officials from civil suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Thus, qualified immunity protects a defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was objectively reasonable for the officer to believe his conduct did not violate a clearly established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal citations and quotation marks omitted).  Defendants argue both that their conduct did not violate a clearly established constitutional right, and that it was objectively reasonable to believe that their conduct did not violate a clearly established constitutional right.

Defendants' arguments on both prongs of the qualified immunity analysis assume their version of events as true.  Thus, Defendants argue that the relevant inquiry for this Court is whether it was clearly established law that "an officer is prohibited . . . from taking a resistant suspect to the ground in order to handcuff him where the suspect has been informed that he is under arrest yet resists the officer's efforts to handcuff him." (*See* Defs.' Mem. Supp. [Doc. # 48-1] at 14.)  However, based on the record before the Court, a reasonable jury could conclude that Plaintiff did not resist arrest, and that he was

12

first pulled to the floor and then struck and slammed into the ground, suffering serious injury. Defendants' framing of the relevant inquiry disregards that evidence in the record does not support only this conclusion. Plaintiff has alleged a violation of his clearly established Fourth Amendment right to be free from excessive force by claiming that Defendants threw him to floor, and then struck him and slammed his head into the ground, hard enough to fracture his tooth and dislocate his jaw, while he was lying face down and multiple officers were placing him in handcuffs. *See Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) ( "It is beyond dispute that the right to be free from excessive force has long been clearly established"); *see also O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1998) (noting that repeatedly striking the head of a person unable to defend himself was excessive force). Thus, Defendants are entitled to qualified immunity only if it was objectively reasonable to believe that their use of force during Plaintiff's arrest did not violate Plaintiff's right to be free from excessive force.

Defendants' belief is objectively reasonable if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (internal citations and quotation marks omitted). However, such a determination is not possible where genuine issues of material fact relating to the nature of the force used and the resistance mounted remain outstanding. *See Green*, 219 F.3d at 59 (noting that a genuine issue of material fact prevented a determination of whether reasonable officers could disagree on the legality of the defendant's actions). As discussed above, there are outstanding factual disputes in this case regarding the nature of Plaintiff's resistance and the nature of the force used by Defendants during the arrest. Viewing the facts in the light most favorable to the non-movant, it is hardly clear that officers of reasonable competence would think

that the use of force claimed by Plaintiff was objectively reasonable.  *See Thomas v. Holly*, No. 12–2076, 2013 WL 3722350, at *10 (4th Cir. May 15, 2013) (holding that an officer who forcefully hit an unarmed suspect several times in the face with his knee while the suspect was being handcuffed by other officers was not entitled to qualified immunity); *see also Aranda v. McMinnville*, No. 3:12–CV–00170–SI, 2013 WL 1793942, at *1, *8 (D.Or. Apr. 29, 2013) (holding that officers who repeatedly hit a suspect armed with a pocket knife in the face with their fists and knees were not entitled to qualified immunity).  Therefore, because there are still material facts related to the precise nature of Plaintiff's encounter with Defendants in dispute, Defendants' motion for summary judgment on qualified immunity grounds is denied.  *See Zellner v. Summerlin*, 495 F.3d 344, 368 (2d Cir. 2007) ("If there is no dispute as to the material historical facts, the matter of whether the officer's conduct was objectively reasonable is an issue of law to be determined by the court.  [I]f there is such a dispute, however, the factual questions must be resolved by the factfinder." (internal citations and quotation marks omitted)); *Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir. 1999) ("Because the district court could not determine whether the officers reasonably believed that their force was not excessive when several material facts were still in dispute, summary judgment on the basis of qualified immunity was precluded.").

### C.    Count Four – Assault and Battery

Defendants argue that they are entitled to summary judgment on Plaintiff's assault and battery claim for the same reason that they are entitled to summary judgment on his excessive force claim.  "To establish a claim for assault and battery, [a] plaintiff must prove that defendants applied force or violence to h[im] and that the application of force or violence was unlawful."  *Odom v. Matteo*, 772 F. Supp. 2d 377, 395 (D. Conn.

2011).  The Second Circuit has recognized that state claims for assault and battery and § 1983 claims for excessive force are essentially the same, with the exception that a plaintiff must prove that the defendant acted under color of law to succeed on an excessive force claim.  *See Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991).  Thus, because there remain genuine issues of material fact as to whether Defendants used excessive force against Plaintiff, Defendants' motion for summary judgment on Count Four is denied.[6]

### D.    Counts Two and Five – False Arrest and False Imprisonment

Defendants argue that they are entitled to summary judgment on Plaintiff's claims for false arrest and false imprisonment because they had probable cause to arrest Plaintiff, the officers who observed Plaintiff's arrest had no duty to intervene, and the officers are entitled to qualified immunity.[7]

#### 1.    Probable Cause

"In analyzing claims alleging the constitutional tort of false arrest, [the Second Circuit has] generally looked to the law of the state in which the arrest occurred."  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (internal citations and quotation marks omitted).  Thus, Plaintiff's § 1983 claim for false arrest, and his state law claim for false imprisonment are generally evaluated under the same standard.  In Connecticut, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another."  *Green v. Donroe*, 186 Conn. 265, 267 (1982).  To establish a

---

[6] Plaintiff does not specify in the Complaint against which Defendants this claim is asserted.  To the extent that Plaintiff brings assault and battery claims against defendants who merely observed his arrest, and used no force against him, the Court grants summary judgment on Count Four with respect to those defendants.

[7] Because the Court concludes that Defendants had probable cause to arrest Plaintiff, it need not discuss the parties' arguments with respect to qualified immunity.

claim for false arrest under § 1983, a plaintiff is required to show that "the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir. 2004) (internal citations and quotation marks omitted).

A false arrest or false imprisonment claim will fail if the defendant-officer had probable cause to arrest the plaintiff. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (noting that probable cause is "a complete defense to an action for false arrest"). "Probable cause exists when an officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Curely v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). In Connecticut, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." *State v. Grant,* 286 Conn. 499, 511 (2008). "When information is received from a putative victim or an eyewitness, probable cause exists, . . . unless the circumstances raise doubt as to the person's veracity." *Curley*, 268 F.3d at 70 (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995). "[P]robable cause does not demand any showing that a good-faith belief be correct or more likely true than false." *Walczyk v. Rio,* 496 F.3d 139, 157 (2d Cir. 2007) (citing *Texas v. Brown,* 460 U.S. 730, 742 (1983)). Rather, it requires "only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.* "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006).

Plaintiff was arrested for third-degree assault, interfering with a police officer, and risk of injury to a minor.  Under Connecticut law, an individual is guilty of third-degree assault when:

> (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon.

Conn. Gen. Stat. § 53a-61.   An individual interferes with a police officer when he "obstructs, resists, hinders or endangers any [officer] in the performance of such [officer's] duties." Conn. Gen. Stat. § 53a-167a.  An individual is guilty of risk of injury to a minor if he "willfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child."  Conn. Gen. Stat. § 53-21.  Defendants claim that they had probable cause to arrest Plaintiff for each of these offenses, and that Plaintiff's claims for false arrest and false imprisonment therefore fail.

In his opposition, Plaintiff makes the conclusory argument that "the officers [sic] own accounts establish there was no probable cause to arrest the plaintiff."  (*See* Pl.'s Opp'n at 17.)   Plaintiff states that the video footage of the basketball game supports this argument because it shows that he tackled the New London player in an effort to stop him from harming others.  Regardless of Plaintiff's motivation for tackling the player, based on the record, there was probable cause to arrest him for assault and risk of injury to a minor.  Plaintiff offers no evidence to contradict the officers' statements that they interviewed several eyewitnesses who informed them that one of the New London players

had been tackled and identified Plaintiff as the individual who had tackled the player. (*See, e.g.*, Rodgers Aff. ¶¶ 6–9.)    The officers also had the opportunity to view the videotape of the game before they arrested Plaintiff.  (*See id.* ¶ 11.)  The video contradicts Plaintiff's version of events, as it appears to show Plaintiff strike the New London player several times after tackling him.  (*See* Basketball Game Video.)    Thus, Defendants had probable cause to believe that Plaintiff had recklessly or intentionally caused serious injury to the player, and that he had acted in a manner likely to impair the health of the minor player.  Even accepting Plaintiff's version of events as true, the fact that Plaintiff tackled the New London player, regardless of his motivation for doing so, represented probable cause to arrest him for risk of injury to a minor.  Therefore, Defendants' motion for summary judgment is granted with respect to Counts Two and Five.

> 2.    *Duty to Intercede*

Defendants argue that the officers who observed Plaintiff's arrest are entitled to summary judgment on Plaintiff's false arrest and false imprisonment claims because they had no duty to intercede as the arrest was supported by probable cause.  Because there was no evidence that Plaintiff's constitutional rights were violated by the fact of his arrest, Defendants' motion for summary judgment on this ground is granted.

### E.    Count Six – Intentional Infliction of Emotional Distress

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must show:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe . . . .  Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine . .

. . Only where reasonable minds disagree does it become an issue for the jury.

*Appleton v. Bd. of Educ.*, 254 Conn. 205, 210–11 (Conn. 2000).  Plaintiff has submitted an affidavit in which he avers that he is "emotionally devastated" and has suffered depression and nightmares as a result of the incident.  (Crawford Aff. ¶ 33.)   Defendants argue that Plaintiff may not create a genuine factual issue that would preclude summary judgment "solely by an affidavit crafted to oppose a summary judgment motion."  (Defs.' Reply [Doc. # 56] at 5 (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).)   Relying on *Hayes*, Defendants argue that because Plaintiff did not mention emotional distress in his deposition, his affidavit contradicts his prior testimony and is therefore invalid.  However, the Court does not have Plaintiff's full deposition before it, and thus cannot determine whether Plaintiff was given an opportunity to testify as to his emotional suffering and failed to do so.  Therefore, the Court will consider Plaintiff's affidavit in ruling on the motion for summary judgment.

Defendants further argue that Plaintiff's statements in his affidavit are  insufficient to show that his emotional distress was "severe" because Plaintiff's responses to written discovery indicate that he never sought treatment for emotional distress.  (*See* Pl.'s Responses to Defs.' Interrogatories, Ex. T to Defs.' 56(a)1 Stmt. at 9-10.)   However, the fact that an individual failed to seek treatment for emotional distress is not fatal to a claim for intentional infliction of emotional distress.  *See Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 175–76 (D. Conn. 2003).  Rather, "Connecticut courts have held that emotional distress is severe when it reaches a level that 'no reasonable person could be expected to endure.'"  *Id.* (quoting *Mellaly v. Eastman Kodak*, 42 Conn. Supp. 17 (1991)).

Thus, the affidavit is sufficient to raise a question of fact as to the severity of Plaintiff's emotional injury.

For the first time in their reply, Defendants also argue that there is insufficient evidence to establish that they intended to inflict emotional distress on Plaintiff or should have known that his distress was the likely result of their conduct.  In making this argument, Defendants assume that the Court will accept their version of events as true.  However, as discussed above, a reasonable jury could conclude that Plaintiff was subjected to an unwarranted beating by multiple officers.  Based on this version of events, a reasonable jury could conclude that Defendants should have known that their actions were likely to result in emotional distress.  Therefore, Defendants' motion for summary judgment is denied with respect to Count Six.

### F.   Counts Seven and Eight– Negligent Infliction of Emotional Distress and Negligence

Defendants argue that they are entitled to summary judgment on Plaintiff's claims for negligent infliction of emotional distress and negligence because the record fails to show that Plaintiff suffered severe emotional distress, they breached no duty to Plaintiff, and they are entitled to governmental immunity.

#### 1.   *Severe Emotional Distress*

To establish a claim for negligent infliction of emotional distress under Connecticut law, a plaintiff must show "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).  Defendants argue that

Plaintiff has failed to offer evidence in support of the third element of his negligent infliction of emotional distress claim because the claims in his affidavit are insufficient to support an inference that he could have suffered illness or bodily harm as a result of his emotional distress, and because he failed to seek medical treatment for his emotional injuries.

The fact that Plaintiff has not submitted medical or treatment records showing that his distress caused physical symptoms is not dispositive of his claim. *See Vincent v. Essent Health Care of Connecticut*, 470 F. Supp. 2d 140, 150 (D. Conn. 2007). In *Vincent*, the court declined to grant summary judgment on a negligent infliction of emotional distress claim where the plaintiff's medical records did not disclose any physical injury and the plaintiff stated that she was not physically ill. *Id.* The court found that this lack of evidence was not dispositive if the plaintiff's emotional injury "impair[ed] her ability to carry on and enjoy life's activities." *Id.* (internal citations and quotation marks omitted). Because the plaintiff stated that she was "often depressed due to the changes in [her] life," and had "experienced sleeplessness, nausea and headache" and "emotional distress and upset," the court held that there was a genuine issue of material fact as to whether she had suffered severe emotional distress. *Id.* Plaintiff here has submitted an affidavit in which he avers that he is emotionally devastated, has suffered depression and nightmares, and has sought treatment for headaches. Thus, Plaintiff has offered minimally sufficient evidence that his emotional injury impaired his "ability to carry on and enjoy life's activities" and there is a genuine issue of material fact as to whether he suffered severe emotional distress.

In their reply, Defendants also argue that their conduct did not create an unreasonable risk of Plaintiff's emotional distress and that his distress was not

21

foreseeable.   However, as with their arguments on Plaintiff's intentional infliction of emotional distress claim, Defendants assume the veracity of their version of events. Where, as here, a jury could find that an individual was beaten by multiple police officers and suffered public humiliation and physical injuries, it is for the jury to determine whether there was a foreseeable risk that Plaintiff would suffer emotional distress as a result of those events.   Therefore, Defendants' motion for summary judgment on these grounds is denied.

### 2.    *Negligence*

Under Connecticut law, the elements of  a claim for negligence are duty, breach, causation, and actual injury.  *RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 384 (1994).   Defendants argue that because they did not use unreasonable force against Plaintiff and had probable cause to arrest him, they did not breach the duty they owed to him.   Defendants cite no authority for this proposition, and as discussed above, there remains a genuine issue of material fact as to whether Defendants used unreasonable force against Plaintiff.   Therefore, Defendants' motion for summary judgment on these grounds is denied.

### 3.    *Governmental Immunity*

Defendants argue that they are entitled to governmental immunity on Plaintiff's negligence claims pursuant to Conn. Gen. Stat. § 52-557n, which provides limited immunity to public officials for certain activities.   "Generally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts."  *Mulligan v. Rioux,* 229 Conn. 716, 727 (1994). Plaintiff does not dispute that the decision to arrest him and the manner in which he was arrested were discretionary acts for which Defendants would normally be entitled to

governmental immunity.  Rather, he asserts that the identifiable person-imminent harm"
exception bars governmental immunity in this case.  As the Connecticut Supreme Court
has explained:

> Discretionary act immunity is abrogated when the circumstances make it
> apparent to the public officer that his or her failure to act would be likely
> to subject an identifiable person to imminent harm.  By its own terms, this
> test requires three things: (1) an imminent harm; (2) an identifiable victim;
> and (3) a public official to whom it is apparent that his or her conduct is
> likely to subject that victim to that harm.

*Doe v. Petersen*, 279 Conn. 607, 616 (2006) (internal citations and quotation marks
omitted).

Defendants first argue that Plaintiff was not in an "identifiable class of foreseeable
victims" because the only class of foreseeable victims recognized by the Connecticut
Supreme Court is school children attending public school during school hours, and
Plaintiff was neither a student nor at the high school during school hours.  *See Durrant v.
Bd. Of Educ. of Hartford*, 284 Conn. 91, 102 (2007).  However, Plaintiff does not argue
that he was in a foreseeable class of victims.  Rather, he argues that he was individually a
foreseeable person, citing several cases in which the identifiable person-imminent harm
exception applied in the context of an excessive force claim.  *See Santana v. Rohan*, No.
CV-040830569S, 2005 WL 16634310 (Conn. Super. Ct. June 7, 2005); *Balogh v. City of
Shelton*, No. CV990067521S, 2002 WL 523225 (Conn. Super. Ct. Mar. 1, 2002); *Castoria
v. Stewart*, No. CV 950324487, 1998 WL 309393 (Conn. Super. Ct. June 3, 1998).
Defendants attempt to distinguish these cases by arguing that in each of those cases, the
police were responding to a specific call about a specific individual, at a specific location,
and thus the plaintiffs were identifiable persons, whereas here, Defendants responded to a
call about a brawl at the high school, and could not have identified Plaintiff as an

23

individual who would potentially come into harm's way as a result of their response to that call.

However, "courts in this district have applied the identifiable person-imminent harm exception in the context of excessive force claims based on affirmative acts where the harm to the individual is so foreseeable as to create . . . a duty of care." *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 367 (D. Conn. 2008) (collecting cases) (holding that the plaintiff was a foreseeable and identifiable victim of imminent harm where the defendant officer struck the plaintiff with his baton because the defendant purposefully swung the baton at the plaintiff's face without warning).  Here, although Defendants might not have been able to identify Plaintiff as a foreseeable victim when they arrived on the scene, by the time the altercation with Plaintiff broke out, Defendants had interviewed witnesses, reviewed evidence, and determined that there was probable cause to arrest Plaintiff for a violent crime.  Thus, a jury could conclude that when Defendants decided to question Plaintiff, he became an identifiable victim.  Defendants also argue that the harm to Plaintiff was not foreseeable, but they do so assuming their version of events as true.  When viewing the facts in the light most favorable to the non-movant, as in *Belanger*, Defendants purposefully struck Plaintiff unexpectedly.  As such, there remains a genuine issue of material fact as to whether the identifiable person-imminent harm exception applies to Plaintiff's negligence claims.  Therefore, Defendants' motion for summary judgment on Counts Seven and Eight is denied.

G.        **Count Nine –** *Monell* **Claim**

Defendants argue that Plaintiff has failed to establish his claim for municipal liability on his § 1983 claims under either a theory of failure to train or to supervise against New London and against Chief Ackley in her official capacity.[8]

Section 1983 does not provide for respondeat superior liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Beyond simply alleging that New London employed tortfeasors on its police force, Plaintiff must allege that his constitutional injuries were caused by actions taken "pursuant to official municipal policy." *Id.* In *Monell,* municipal liability was premised on the municipality's affirmative conduct, but municipal nonfeasance can also qualify as a policy or practice that renders a municipality liable:  "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989)).

Under either a failure-to-train or failure-to-supervise theory, a municipality is liable only where the inadequate training or supervision amounts to "deliberate indifference to the rights of person with whom the [officials] come into contact." *City of Canton v. Harris,* 489 U.S. 378, 388 (1989); *see also Reynolds,* 506 F.3d at 192 ("Although *City of Canton* addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims [including failure to supervise].").    From this

_____

[8] At oral argument, Plaintiff's counsel clarified that Plaintiff does not assert a claim for supervisory liability against Chief Ackley in her individual capacity.

deliberate-indifference standard, the Second Circuit has established three requirements: (1) "the plaintiff must show that a policymaker knows to a moral certainty that her employees will confront a given situation," (2) "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation," and (3) "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir. 1992); *see also Reynolds,* 506 F.3d at 193.

Defendants argue that because Plaintiff has offered no evidence of New London's policies regarding its police force, and has failed to identify a specific deficiency in its training program that gave rise to his injuries, they are entitled to summary judgment on Plaintiff's failure to train claim.  The Court agrees.  There is no evidence in the record regarding New London's police training program in general, or regarding the specific training that each individual defendant received.  In the absence of such evidence, there is no triable issue of fact and Defendants are entitled to summary judgment with respect to Plaintiff's failure to train theory.  *See Jenkins v. City of New York,* 478 F.3d 76, 94 (2d Cir. 2007) ("In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" (quoting *Green v. City of New York,* 465 F.3d 65, 81 (2d Cir. 2006)); *see also Amnesty America*, 361 F.3d at 130 (rejecting the plaintiffs' failure to train theory because they failed to offer specific evidence on the defendant's training program).

With respect to Plaintiff's failure to supervise claim, Plaintiff does not argue that there was a pattern or practice of failure to supervise New London officers in the use of

force.  Rather, Plaintiff relies on *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir. 1980) for the proposition that "a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge."  However, in *Turpin,* the Second Circuit concluded that evidence that the plaintiff had been previously assaulted and arrested by the police, that the arresting officer was not disciplined, and that the plaintiff subsequently was arrested a second time, was inadequate as a matter of law to establish the municipality's deliberate indifference toward the violation of the plaintiff's rights.  *See id.* at 202–04.  By contrast, in *Owens v. Haas,* 601 F.2d 1242 (1979), the Second Circuit found that the brutal beating of an inmate by seven correctional officers, including at least one high-ranking officer and several newly hired officers, could be sufficient to support an inference of failure to supervise or to train.  *See id.* at 1246–47 (permitting limited discovery to pursue this theory).  Similarly, in *Amnesty America*, the Second Circuit found that the plaintiffs' failure to supervise theory presented a triable issue of fact on the basis of one egregious incident.  In that case, multiple officers responding to an abortion protest used enough force while arresting the passively resisting protesters such that their screams of pain could be heard throughout the clinic and several of the demonstrators blacked out from the pain.  *See* 361 F.3d at 118–19.  The Chief of Police was present during the protest, failed to intervene, and also participated in the use of force at a subsequent protest.  *Id.* at 119–20.

Here, accepting the facts in the light most favorable to Plaintiff, a jury could find that Plaintiff did suffer a serious beating at the hands of a group of officers.  Plaintiff has offered evidence that he lost consciousness and suffered serious injuries as a result of this

beating, including a fractured tooth and a dislocated jaw, some of which are ongoing. There were at least seven officers present at the high school at the time of Plaintiff's arrest, and many of them personally used force against him, including one officer who had attained the rank of sergeant.   Although these circumstances resemble those present in *Amnesty International* in many respects, that case is significantly distinguishable by the presence and participation of the Chief of Police in the use of force.   Furthermore, in *Amnesty International*, the alleged beatings took place during two separate protests. Here, no final decision-maker or policymaker had any personal involvement or even presence at the single event.   Without such personal involvement by a policymaker, the evidence in the record is insufficient to support the inference of gross negligence with respect to the supervision of the New London Police Department.   Therefore, Defendant's motion for summary judgment is granted with respect to Count Nine.

### H.   Count Ten – Indemnification and Municipal Liability

New London argues that the Court should grant summary judgment in its favor on Count Ten because Plaintiff cannot establish municipal indemnification or liability under either Conn. Gen. Stat. § 52-557n or § 7-465.

#### 1.   *Conn. Gen. Stat. § 52-557n*

New London argues that it is entitled to governmental immunity under Conn. Gen. Stat. § 52-557n to the same extent that the individual defendants are entitled to such immunity on Plaintiff's negligence claims.   As discussed above, there is a genuine issue of material fact as to whether the identifiable person-imminent harm exception applies in this case.   Although neither party has addressed this issue, pursuant to Conn. Gen. Stat. § 52-557n, "a political subdivision of the state shall not be liable for damages . . .   caused by . . . [a]cts or omissions of any employee, officer or agent which constitute criminal

conduct, fraud, actual malice or willful misconduct."  Thus, Plaintiff's surviving claims for excessive force, assault and battery, and intentional infliction of emotional distress constitute willful misconduct that would defeat Plaintiff's municipal liability claim.  *See Miner v. Town of Cheshire*, 126 F. Supp. 2d 184 (D. Conn. 2000).  Therefore, to the extent that Plaintiff's negligence claims survive, Defendants' motion for summary judgment on Plaintiff's § 52-557n claim is denied, but the motion is granted to the extent that Plaintiff claims municipal liability arising from his intentional tort claims.

### 2.    Conn. Gen. Stat. § 7-465

Conn. Gen. Stat. § 7-465 provides that a municipality must indemnify its employees for any liability they incur when acting in the course of their employment, provided that the liability incurred was "not the result of any willful or wanton act of such employee in the discharge of such duty."  New London thus argues that because Plaintiff has alleged that the individual defendants acted willfully and maliciously, it is not liable to indemnify them for any of Plaintiff's claims.  However, as Plaintiff correctly argues, to the extent that Plaintiff's negligence claims survive, New London is liable to indemnify the individual defendants as to those claims.  Because the Court denies Defendants' motion for summary judgment on Counts Seven and Eight, the Court also denies the motion as to Plaintiff's claim under Conn. Gen. Stat. § 7-465.

### III.    Conclusion

For the foregoing reasons, Defendant's Motion [Doc. # 48] for Summary Judgment is GRANTED with respect to Counts Two, Five, and Nine, and DENIED with respect to Counts One, Four, Six, Seven, Eight, and Ten.  As to Count Four, Plaintiff's assault and battery claim survives only to the extent it is alleged against defendants who actually used force against Plaintiff.  As to Count Ten, Plaintiff's claim for municipal

liability and indemnification survives only with respect to Plaintiff's state-law claims that sound in negligence.  Count Three, and Defendants McBride and Ackley are dismissed from this action.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 16th day of January, 2014.